IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

SAMUEL LEROY DONALDSON,       )
                              )
            Plaintiff,        )
                              )
vs.                           )   Case No. 13-6125-CV-SJ-ODS
                              )
CAROLYN W. COLVIN,            )
Acting Commissioner of Social Security, )
                              )
            Defendant.        )

ORDER AND OPINION AFFIRMING
COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's appeal of the Commissioner of Social Security's final decision denying his application for disability benefits under Titles II and XVI. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in July 1977, has a ninth grade education, and has prior work experience as an animal caretaker, stock clerk, dishwasher, fast food worker, order filler, forklift operator, satellite installer, packer, construction worker, and short order cook. His alleged onset date was amended to April 25, 2011 – the day he underwent surgery for an aortic valve replacement. R. at 38-39. He contends he became disabled on that date due to a combination of his heart condition and mental issues.

A.

As one might expect there are a multitude of medical records related to Plaintiff's heart surgery and treatment; nonetheless, the Court's attention is called to only a few of them. The Court has examined all of the medical records indicated to be important by

the parties and the ALJ; the Court has also examined some of the other medical records.

At the time of his surgery Plaintiff's ejection fraction – that is, the percentage of blood leaving his heart upon each contraction – was between twenty-five and thirty percent. R. at 1038.[1]  Unsurprisingly, on May 29 – approximately one month following his heart surgery – Plaintiff reported "a little bit of chest pain," but he had been doing well since his discharge. R. at 367. Plaintiff's ejection fraction had increased to forty percent which was noted to be an improvement. R. at 374. At some point following surgery, Plaintiff developed a bacterial infection in his heart and was advised to come to the hospital if he noted any change in his condition. To that end, on June 21 Plaintiff went to the emergency room complaining of weakness. He was examined and discharged. R. at 766-67.

On August 17, Plaintiff complained of shortness of breath "with physical exertion," fatigue, and chest pressure. Arrangements were made for him to be seen at the cardiology clinic later that week. R. at 882. On August 19 Plaintiff saw a cardiologist and reported shortness of breath and chest pain that manifested two weeks prior and that was "aggravated by mild activity." Plaintiff's medication was adjusted. R. at 1026-27. Later that month, Plaintiff went to the emergency room where he was described as "very weak and disoriented" and complaining of "acute anxiety with shortness of breath," feelings of "being suffocated," and "pain in his chest consistent with angina type of discomfort." R. at 754-55. He was transferred to another hospital, where it was determined Plaintiff's symptoms were secondary to the surgery and that he was "[o]kay to discharge from cardiac standpoint." He was prescribed anti-inflammatories and discharged. R. at 723-25; see also R. at 726-29. Plaintiff's ejection fraction was between fifty and fifty-five percent. R. at 1040.

---

[1] According to the Mayo Clinic, "[a]n LV ejection fraction of 55 percent or higher is considered normal. An LV ejection fraction of 50 percent or lower is considered reduced. Experts vary in their opinion about an ejection fraction between 50 and 55 percent, and some would consider this a 'borderline' range." http://www.mayoclinic.org/ejection-fraction/expert-answers/FAQ-20058286 (last visited May 5, 2015).

2

In October, Plaintiff reported that his chest pain had improved. R. at 1028-29. In December 2011 and January 2012 Plaintiff was tested to assess the effectiveness of his anticoagulant medication and reported no problems or difficulties. R. at 876. R. at 1367-68. In May 2012 a cardiologist stated Plaintiff's "fatigue and exertional dyspnea are under control. Feels better than he was last time around." R. at 1219. Later that month Plaintiff reported dizziness, but this was determined to be related to sinus surgery Plaintiff underwent earlier that month and not to his heart. R. at 1092-93.

At some point Plaintiff stopped taking his medication. Two such occasions occurred in February and March of 2012, when Plaintiff told his doctor he forgot to pick it up. R. at 1369, 1371. In August, Plaintiff told his doctor that he had not been taking his medication for two months and thereafter he "started developing intermittent chest pain and shortness of breath." He was hospitalized and medication was administered; unsurprisingly, "[w]ith simply resuming his medications, the patient's pain and symptoms slowly subsided." R. at 1229. In October he told the doctor that his three week hiatus in medication was because he had "missed his Medicaid for a few weeks" and not because he lacked access to it. R. at 1269.[2]

In September Plaintiff went to the emergency room. He was intoxicated and complaining of chest pains and shortness of breath. He also reported his extremities were turning blue, but the examining doctor indicated this was not the case. Plaintiff was taken to another hospital. R. at 1116-17. There he was diagnosed with suffering from "[a]typical chest pain, resolved, and noncardiac in nature." R. at 1193. In October, Plaintiff again reported a shortness of breath – but he also reported failing to take his medication within the last two days. R. at 1375. Later in the month he reported chest pain, which again was found to be unrelated to his heart problems. R. at 1274, 1312. In November, Plaintiff's ejection fraction was fifty to sixty percent. R. at 1194, 1197. In January 2013, Plaintiff reported that "in the last 3 months he has not had many

---

[2]The ALJ cited these records to support his conclusion that Plaintiff "claimed he could not afford his medications because he did not have Medicaid, but even after he was put back on Medicaid, he still did not get his medicines." R. at 25. Plaintiff addresses his failure to take his medication but in doing so he does not dispute this interpretation of Plaintiff's statements to his doctors.

3

complications, no hospitalizations, no major problems with his anticoagtulation and no major psychiatric problems either." R. at 1315.

In addition to these (and other) records, there are three records from Dr. Joseph Bodet – the doctor Plaintiff proffers as a treating physician. This proffer is made even though Dr. Bodet saw Plaintiff on only three occasions, and on less occasions than other doctors involved in his cardiac care. On October 16, Plaintiff "denie[d] chest discomfort with exertion but describes pain when recumbent." Dr. Bodet altered Plaintiffs' medication. R. at 1030-31. On October 25, Plaintiff saw Dr. Bodet complaining of chest pain that "occurred the day after moving boards around for a friend." Plaintiff also exhibited "some exertional dyspnea." Dr. Bodet again altered Plaintiff's medication. R. at 1045-47, 1061. The final time Dr. Bodet saw Plaintiff was in January 2013. Plaintiff reported that he was "sleeping 10 hours daily and never feels rested." He denied experiencing shortness of breath, palpitations, lightheadedness or chest pain. R. at 1033. Dr. Bodet adjusted Plaintiff's medications again. R. at 1034.

After these three examinations, on March 4, 2013, Dr. Bodet completed a Medical Statement spanning slightly more than one page long. On the statement, Dr. Bodet checked lines indicating Plaintiff experiences

- fatigue on exertion,
- shortness of breath on mild exercise,
- angina discomfort with or without exertion,
- intolerance to cold
- persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living, and
- an ejection fraction of thirty-five to forty percent.

Dr. Bodet also indicated Plaintiff could work for only four hours per day, could stand for fifteen minutes at a time, sit for thirty minutes at a time, and lift five pounds frequently and ten pounds occasionally. R. at 1319.

4

## B.

According to Plaintiff, his history of mental health treatment commenced in October 2011 when he went to St. Francis Family Life Service. On that initial visit Plaintiff reported a range of symptoms including depression, thoughts of harming himself, lack of energy, frustration, irritability, mood swings, paranoia, frustration, and hallucinations. R. at 1210. He was apparently prescribed medication; regardless, three weeks later his symptoms had diminished. Notably, he no longer reported thoughts of harming himself, crying episodes, lack of energy, or panic attacks. R. at 1211. His medication was increased but by January 2012 his symptoms remained largely unchanged. R. at 1212. On January 25, 2012, Dr. Attaullah Butt opined that Plaintiff's GAF score was 45. Dr. Butt wrote that when Plaintiff was not on medication he reported a variety of problems, including auditory hallucinations, paranoid delusions, problems with anger and irritability, memory problems and depression. However, with medication, Plaintiff "reports that his voices have muffled down significantly [and] his moods are mostly down to the point where he has no energy, no motivation, feels total apathy, feeling helpless, hopeless, and powerless and gets overwhelmed. . . . He also reports episodes of racing thoughts." R. at 1213. Dr. Butt issued a similar report on March 21, 2012. R. at 1215. This was the last time Plaintiff was seen at St. Francis or by Dr. Butt.

In September 2012 Plaintiff was taken to Heartland Regional Medical Center ("HRMC") as a result of 96 hour civil commitment following an incident in which Plaintiff argued with, and eventually threatened to hurt, his wife. HRMC assessed Plaintiff as presenting "with increasing aggressive behavior toward family after arguing with wife today . . . Denies suicidal ideation and [h]eard voices telling him to 'kill the bitch'. . . . Character of symptoms depressed angry. . . . .Exacerbating factors consist of family problems." R. at 1164. His GAF on admission and on discharge was determined to be 25. R. at 1172, 1174.

From October to December 2012, Plaintiff had twelve visits with therapists at North Central Missouri Mental Health ("North Central"). Plaintiff asserts the therapists "were supervised by psychiatrist Kenneth D. Richards, D.O." but he does not identify any documents prepared by Dr. Richards. He also does not specify anything in the

records from North Central that would support his disability claim, leaving it to the Court to examine the Records on its own. The Records suggest Plaintiff's problems are largely the result of situational stressors and (importantly) that they are effectively controlled with medication. R. at 1327-55.

## C.

Plaintiff testified that he sleeps twelve to eighteen hours per day. R. at 48, 56. He also testified that he engages in minimal activity: he picks up around the house, vacuums, and loads the dishwasher, but does not do much else. R. at 48-49. However, he also indicated that he overexerts himself when he works in the yard or garden. R. at 49. He estimated he could stand for ten to forty-five minutes at a time before needing to rest for twenty to thirty minutes, walk one to one-and-a-half blocks, and sit for forty-five minutes (at which point his legs would go numb). R. at 54-55. He also testified that he feels depressed and hears muffled voices and often wants to be isolated from people. R. at 51.

Plaintiff's testimony stands in contrast to the Function Report he submitted in connection with his application. There, he indicated his day starts with him fixing breakfast, and then cleaning around the house until lunchtime. In the evening he helps his four children "settle down from school" and, depending on the weather, he will "work outside until suppertime" and "play around with the kids until bedtime." R. at 256. On a separate page asking him to list the "household chores, both indoors and outdoors" that he could perform, Plaintiff simply wrote "All." R. at 258. He reported going out daily and shopping a couple of times a month. R. at 259.

## D.

The ALJ found Plaintiff retained the residual functional capacity ("RFC") to lift twenty pounds occasionally and ten pounds frequently, stand or walk two hours a day and sit for six hours per day, was limited to simple, repetitive tasks, could have occasional contact with co-workers, supervisors, and the public, could not perform

assembly line or piece work, and could follow simple instructions. The RFC also includes limitations on Plaintiff's ability to climb, crouch, reach, etc. R. at 20. In formulating the RFC, the ALJ accorded "little" weight to Dr. Bodet's Medical Statement because he saw Plaintiff on only three occasions, his opinions were not supported by his own examinations, his opinions were not supported by Plaintiff's reported symptoms, and his opinions were inconsistent with other evidence in the Record. R. at 23. In addition to the evidence described in Part I.A, the ALJ relied on consultative examination of Dr. Judith Vogelsang. R. at 22.

The ALJ discussed the evidence regarding Plaintiff's mental issues, as well as the consultative reports of an examining psychologist (Louis Bein) and a state agency consultant (James Morgan). The ALJ explained why the low GAF scores were not determinative, and he also explained why he concluded Plaintiff "was capable of performing simple repetitive tasks in a low stress environment" and follow simple instructions. R. at 23-25. In particular, the ALJ found "that limiting the claimant . . . to simple instructions and repetitive tasks will account for the claimant's ability to remember and would not require much concentration. For the same reason, the undersigned finds the claimant cannot do assembly line work or piece work because he may become distracted. . . . .[T]he undersigned finds the claimant can have only occasional contact with co-workers, supervisors and the general public [but a]s the claimant is able to interact with his children and go shopping, he should be able to deal with at least occasional contact with co-workers, supervisors and the public." R.at 24-25.[3]

The ALJ assessed Plaintiff's credibility and gave "little weight to the claimant's testimony for multiple reasons." These reasons included: Plaintiff's daily activities were inconsistent with his testimony as well as any suggestion of disabling symptoms, Plaintiff had not always been compliant with doctor's instructions to take medication,

---

[3]The ALJ also discussed why the GAF scores were not determinative of Plaintiff's functional abilities. R. at 24. Plaintiff does not specifically challenge the ALJ's decision in this regard. Regardless, a claimant's GAF score is not automatically determinative or controlling. E.g., Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010); Juszczyk v. Astrue, 542 F.3d 626, 632-33 (8th Cir. 2008).

7

Plaintiff's testimony conflicted with his statements to doctors, and Plaintiff lacked a strong work history. R. at 25.

A vocational expert ("VE") testified in response to a hypothetical question incorporating the RFC ultimately found by the ALJ. The VE testified that a person limited as described in the RFC could not perform that person's past relevant work. However, such a person could perform other sedentary work in the national economy, such as printed circuit board screener, document preparer, and pharmaceutical processor. R. at 65. Based on this testimony the ALJ found Plaintiff was not disabled.

## II.  DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

### A.

Plaintiff contends the ALJ erred in failing to defer to Dr. Bodet's Medical Statement. In so doing, Plaintiff invokes cases instructing that deference is ordinarily due to a treating physician's opinions. The Court is not convinced that Dr. Bodet was Plaintiff's treating cardiologist – he was one of many cardiologists involved in Plaintiff's care, but he does not appear to have been one with significant responsibility or

involvement. Dr. Bodet's involvement appears limited to the three examinations discussed earlier and there are others who appear to have been more involved in Plaintiff's care and treatment.

Regardless of whether Dr. Bodet is entitled to the label of "treating physician," the Court discerns no error because the ALJ's decision to discount the Medical Statement was justified by substantial evidence. First, Social Security Regulations specify that "the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." 20 C.F.R. § 416.927(c)(2)(i); see also Nelson v. Sullivan, 966 F.2d 363, 367-68 (8th Cir. 1992) (holding this regulation "merely codifies this circuit's law regarding the opinions of treating physicians"). Dr. Bodet saw Plaintiff three times in a four month span. The ALJ was entitled to consider this fact in ascertaining how much weight to give the doctor's opinion. Second, a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record. E.g., Anderson v. Astrue, 696 F.3d 790, 793-094 (8th Cir. 2012); Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010). There is no clinical data supporting Dr. Bodet's statement that Plaintiff's ejection fraction was in the thirty-five to forty percent range, and the existing clinical data demonstrated that it was actually much higher. There is nothing in Dr. Bodet's contemporaneous notes – or, for that matter, elsewhere in the medical records – justifying the exertional limitations in the Medical Statement. Finally, there is other evidence in the Record – notably, the Function Report Plaintiff prepared and Plaintiff's statements to other doctors – indicating Plaintiff is not as limited as Dr. Bodet described. The Court concludes the ALJ's decision to discount the limitations Dr. Bodet set forth in the Medical Statement was supported by substantial evidence in the Record as a whole.

### B.

Plaintiff next faults the ALJ for not deferring to the opinions expressed by Dr. Butt or the doctors at HRMC. The problem is that none of those doctors offered an opinion regarding Plaintiff's functional capabilities; in other words, they provided nothing to which the ALJ could arguably defer. They described Plaintiff's condition and the ALJ made findings about Plaintiff's condition – none of which are challenged. Even on appeal to this Court, Plaintiff has not pointed to anything in these Records that should have been incorporated in the RFC.

The ALJ evaluated the medical evidence relating to Plaintiff's mental condition. R. at 23-25. The ALJ relied on this evidence to include certain limitations in the RFC finding. The ALJ's findings are supported by substantial evidence.

### C.

Plaintiff's final argument is that the ALJ did not conduct a proper credibility analysis. To some extent, Plaintiff's argument is really an invitation for the Court to re-weigh the evidence, but the Court cannot substitute its judgment of the facts for the ALJ's. E.g., Baldwin v. Barnhart, 349 F.3d 549, 555 (8th Cir. 2003). Plaintiff also contends his non-compliance with doctor's instructions regarding medication was not a proper factor in this case because of his mental illness; he effectively argues that a mentally ill claimant is always (or at least ordinarily) to be expected to not follow a doctor's instructions and cites the Eighth Circuit's decision in *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009). *Pate-Fires* does not stand for the broad proposition Plaintiff advances; as the Eighth Circuit later explained, there must be some evidence connecting the mental impairment to the claimant's failure to follow instructions. Wildman v. Astrue, 596 F.3d 959, 966 (8th Cir. 2010). Nothing in the Record compels Plaintiff's factual assertion that he stopped taking medication "because he is unable to recognize the vital importance of taking them in compliance with his doctor's orders." Doc. # 23 at 23.

The ALJ identified several appropriate reasons for discounting Plaintiff's subjective complaints: inconsistencies between his testimony and his statements to doctors, inconsistencies between his testimony and his Function Report, the assessments and information contained in the medical records, Plaintiff's failure to comply with directions to take medication after his surgery, and Plaintiff's poor work history.  As stated, it is for the ALJ to weigh these factors; all the Court can say is that the ALJ evaluated appropriate factors and that his conclusion is supported by substantial evidence in the Record as a whole.

### III.  CONCLUSION

The Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: May 7, 2015
UNITED STATES DISTRICT COURT